UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| KNOX COUNTY ASSOCIATION FOR ) | |
| RETARDED CITIZENS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CAUSE NO. 2:11-cv-313-WTL-WGH |
| ) | |
| NISH, ) | |
| ) | |
| Defendant. ) | |

### ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the parties' cross-motions for summary judgment. Both motions are fully briefed and the Court, being duly advised, **GRANTS** the Defendant's motion (dkt. no. 53) and **DENIES** the Plaintiff's motion (dkt. no. 56) for the reasons set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). In this case there is no dispute between the parties with regard to what the facts are; their dispute is how the law should be applied to those facts.

## II. FACTUAL BACKGROUND

### A. The AbilityOne Program

Pursuant to the Javits-Wagner-O'Day Act, 41 U.S.C. § 8501, et seq., entities of the federal government generally are required to procure certain products and services from "a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled" in accordance with regulations established by the Committee for Purchase From People Who Are Blind or Severely Disabled ("the Committee"). The program established by the regulations promulgated by the Committee (hereinafter referred to generally as "the Regulations") is commonly known as the "AbilityOne Program." *See* 41 C.F.R. § 51-1.3, et seq. Plaintiff Knox County Association for Retarded Citizens, Inc., ("Knox") is a qualified nonprofit agency that participates in the AbilityOne Program.

Pursuant to the AbilityOne Program, the Committee maintains a "Procurement List," which is a catalog of those services and products that the Committee has determined to be suitable to be furnished to federal entities by nonprofit agencies for the blind or nonprofit agencies employing persons with severe disabilities. The Procurement List identifies the name and national stock number or item designation with respect to each item. The Committee also determines the fair market price of the products on the Procurement List.

Pursuant to the Regulations, a "central nonprofit agency" is designated "to facilitate the distribution (by direct allocation, subcontract, or any other means) of orders of the Government for commodities and services on the Procurement List among nonprofit agencies employing persons who are blind or have other severe disabilities, to provide information required by the Committee to implement the [AbilityOne Program] and to otherwise assist the Committee in administering [the Regulations]." 41 C.F.R. § 51-1.3. Defendant NISH has been designated by

the Committee to represent nonprofit agencies employing persons with severe disabilities other than blindness. 41 C.F.R. §51-3.1. To that end, NISH has various obligations under the Regulations, including a responsibility to "[d]istribute within the policy guidelines of the Committee (by direct allocation, subcontract, or any other means) orders from Government [entities] among its nonprofit agencies." 41 C.F.R. § 51-3.2.

The Regulations set forth the following procedure to be used when a government entity wishes to purchase goods or services contained on the Procurement List. The entity in question, the "ordering office," must submit a written request for allocation to the designated central nonprofit agency. 48 C.F.R. § 8.705-3(a). "Allocation" is defined as "an action taken by a central nonprofit agency to designate the AbilityOne participating nonprofit agencies that will furnish definite quantities of supplies or perform specific services upon receipt of orders from ordering offices." 48 C.F.R. § 8.701. "When an allocation is received, the ordering office shall promptly issue an order to the specified AbilityOne participating nonprofit agency or to the central nonprofit agency, as instructed by the allocation." 48 C.F.R. § 8.705-3(c). In other words, the ordering office asks NISH to designate a particular nonprofit agency to fill a particular order and then places the order with the designated agency. NISH "may charge fees to nonprofit agencies for facilitating their participation in the AbilityOne Program . . . [which] shall be calculated based on nonprofit agency sales to the Government under the AbilityOne Program . . . [and] shall not exceed the fee limit approved by the Committee. 41 C.F.R. § 51-3.5. At all times relevant to this case, the applicable fee limit was 3.75% of sales made under the AbilityOne Program.

### B. The Memorandum of Understanding and Addendum

In April 2006, in anticipation of the United States Army's need to purchase certain cold weather garments[1] that are included on the Procurement List, a document entitled "Memorandum of Understanding Between NISH Products and Eligible Gen III (ECWCS) NPA Producers" ("the MOU") was executed by NISH, Knox, and another qualified nonprofit agency participating in the AbilityOne Program, Peckham Vocational Industries ("Peckham"). The MOU read as follows:

> **Background**
> The U.S. ARMY solicitation for the Gen III Extended Cold Weather Clothing System (Gen III ECWCS) contains (5) garments of the (12) garment system that are on the procurement list (PL). The solicitation for one or more prime contractors will refer interested bidders to NISH Products for the JWOD price and the non profit agency (NPA) to work with on their bid. The contract award is expected on June 29, 2006. This will be a minimum10,000 to maximum 240,000 unit/year contract for (5) years.
>
> **Scope**
> - This agreement applies to requirement for Gen III ECWCS allocations, including allocations by replacement rules, to be procured under JWOD authority.
>
> **Objective**
> - To consider all NPA producers currently on the PL for one or more garments in the Gen III ECWCS solicitation, or that are on the PL for one or more garments previously included in ECWCS and replaced by garments in the Gen III ECWCS.
> - Establish the JWOD price for each garment with input from eligible NPA producers.
> - To provide multiple NPA producers on the PL for each Gen III ECWCS garment.
> - To meet the requirements of the solicitation by providing bidders for the prime contract a NPA producer and the JWOD price for each garment.
> - To document the allocation plan to meet the GEN III (ECWCS) requirements for garments to be procured under JWOD authority.

---

[1] It appears that the actual contract for purchasing the garments in question was entered into by another government entity; as the distinction is irrelevant to the issues in this case, the Court will simply refer to the purchaser as the Army.

**Agreement**
- NISH Products will allocate to Peckham Inc. work to manufacture PDMs for all bidders under the solicitation for the prime contract – Gen III ECWCS at the agreed to JWOD price.
- NISH will inform the bidder and the government customer as to who is the manufacturer of origin for the PDMs.
- NISH Products will allocate to Peckham, Inc. up to documented capability and capacity all JWOD layers, Gen III ECWCS, except the Shirt, MidWeight Cold Weather.
- [Knox] will have the allocation of the Shirt, Midweight Cold Weather based on the rules of replacement, up to documented capability and capacity.
- NISH Products will allocate work exceeding documented capacities to other eligible NPA(s).
- NISH reserves the right to maintain multiple NPA producers on the PL for each Gen III ECWCS garment and to re-allocate work as required to meet the requirements of the contract and JWOD program regulations.

**Qualification**
- All allocations of JWOD work are subject to favorable NPA standing with JWOD regulations and customer satisfaction.
- NISH is obligated to allocate or re-allocate all projects in part or in full as required to meet its responsibilities to the JWOD program.
- This action supercedes all prior agreements relative to the total requirement for Gen III ECWCS allocations, including allocations by replacement rules, to be procured under JWOD authority.

In other words, NISH was to allocate 100% of the midweight cold weather shirts (the "Shirts") purchased by the Army to Knox, up to Knox's "documented capability and capacity."

In August 2008, NISH, Knox, and Peckham executed an Addendum to the MOU. The Addendum provided that it would "alter a portion of the original MOU to adjust the percentage of work allocated under AbilityOne authority for [the Shirts]" but that "[a]ll other conditions of the original MOU dated April 2006 remain in place." The new agreement was set forth as follows:

> NISH Products will allocate to [Knox] seventy-five percent (75%) of the total annual AbilityOne quantity procured by the Army. The remaining twenty-five percent (25%) will be allocated to Peckham in exchange for their development

5

>efforts and for free mentoring, training and support provided by Peckham. The schedule for said mentoring, training and support will be mutually convenient to both parties. In addition to a complete production binder containing manufacturing steps, material supplier contacts, patterns, equipment information, product descriptions, spreading and cutting instructions, measurements, [Knox] is welcome to visit Peckham and Peckham agrees to send three people for a maximum of three days to [Knox] to assist with production start-up. Knox and Peckham will work together, combining AbilityOne purchasing power, to obtain the best pricing and best delivery schedule for the major materials. The pricing and delivery schedules will be agreeable to both [Knox] and Peckham.

The Addendum reiterated that "NISH is obligated to allocate or re-allocate all projects in part, or in full, as required to meet its responsibilities to the AbilityOne Program."

### C. The Allocation

In January 2009, in advance of providing the Allocation to the Army, NISH sent a letter to Knox in which it set out three possible scenarios regarding the number of Shirts that might be ordered by the Army. The first scenario was a minimum order of 170,000 Shirts, 75% of which would be 127,500, or 10,625 per month. NISH noted: "[Knox] has provided a production schedule, with demand for this quantity being met after 24 weeks of production time. . . . Per our conversations, [Knox] believes that it can improve upon this schedule, and can meet monthly requirements by week 16 of production." The second scenario was what NISH believed "could be the actual first buy of this garment" by the Army: 680,000 Shirts, 75% of which would be 510,000, or 42,500 per month. NISH asked Knox to provide a production schedule showing how it would meet that demand. The third scenario involved a maximum quantity of 825,000 Shirts; NISH noted that Knox "also needs to have a ramp up schedule on file to meet this requirement, if and when, it is ordered."

In response to NISH's letter, Knox replied that it would begin at a monthly rate of 2150 Shirts and reach a maximum monthly output of 21,200 Shirts after a 44-week ramp-up period. The maximum 21,200 Shirts per month equates to 254,400 garments per year.

On June 2, 2009, NISH provided to the Army two documents ("the Allocations") in which it set forth the allocations for the Shirts. The Allocations set forth the following quantities:

- In the "base year": minimum 9,350 and maximum 131,100 to Knox; minimum 160,650 and maximum 693,900 to Peckham

- In the "option year 1": minimum 63,600 and maximum 254,400 to Knox; minimum 142,650 and maximum 570,600 to Peckham

No percentages were referenced in the Allocations.

On June 26, 2009, Knox and the Army entered into a contract pursuant to which Knox was to supply, and the Army was to purchase, the following quantities of Shirts: a minimum of 9,350 and a maximum of 131,100 in the base year; a minimum of 52,700 and a maximum of 254,400 in the option year.

Knox completed its ramp-up in April 2010, at which time it was able to produce 21,200 Shirts per month. After that date, the Army issued Delivery Order #4, pursuant to which it ordered 21,840 Shirts from Knox over a four-month period and 87,888 Shirts from Peckham over a three-month period. In Delivery Order #5, the Army ordered 15,000 Shirts from Knox over a three-month period and 90,000 Shirts from Peckham over a 3-month period. In December 2010, NISH issued a Revised Allocation which provided that Knox was to receive 75% of the Army's Shirt orders, up to a maximum of 21,200 per month.

### III. DISCUSSION

Knox's Amended Complaint contains two counts, one for breach of contract and the other for promissory estoppel. Each claim is addressed, in turn, below.

## A. Breach of Contract

Knox's breach of contract claim is based upon its allegation that prior to the issuance of the Revised Allocations in December 2010, NISH failed to make the allocations it promised to make in the MOU and the Addendum. Specifically, Knox alleges that NISH promised that Knox would be allocated 75% of the total number of Shirts purchased by the Army up to its maximum capability and capacity, but that it was in fact allocated a far smaller percentage in Delivery Orders Nos. 4 and 5 because of the manner in which NISH set forth the maximum and minimum quantities for Knox and Peckham in the original Allocations.

As an initial matter, the Court notes that the parties disagree whether Indiana or Virginia law should be applied to Knox's claims. However, it is necessary for the Court to resolve choice of law conflicts "only when a difference in law will make a difference to the outcome," International Adm'rs v. Life Ins. Co., 753 F.2d 1373, 1376 n. 4 (7th Cir.1985), and the parties agree that there is no relevant substantive difference between Indiana and Virginia contract law. Accordingly, the Court will apply the law of the forum state—Indiana—to Knox's breach of contract claim.

NISH argues that it cannot be liable for breach of contract because no contract existed between it and Knox. The Court agrees.

> [I]n order to have a legally binding contract there must be generally an offer, acceptance, and consideration. To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee. A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled. A detriment on the other hand is a legal right the promisee has forborne. The doing of an act by one at the request of another which may be a detrimental inconvenience, however slight, to the party doing it or may be a benefit, however slight, to the party at whose request it is performed, is legal consideration for a promise by such requesting party. In the end, consideration—no matter what its form—consists of a bargained-for exchange.

*Indiana Dept. of State Revenue v. Belterra Resort Indiana, LLC*, 935 N.E.2d 174, 179 (Ind. 2010) (citations and internal quotation marks omitted). In this case, while NISH set forth its intention to make a certain allocation in favor of Knox, it received no consideration from Knox in exchange. Knox did not undertake any obligation to NISH in or as a result of the MOU and Addendum. Had Knox decided not to contract with the Army—or if Knox had contracted with the Army and then failed to perform under that contract—NISH would not have had any recourse against Knox under the MOU and Addendum because they did not require Knox to do anything. Accordingly, there was no consideration for any promise made by NISH to Knox, and therefore no contract was formed between them.

Knox argues that the fee NISH received in the form of 3.75% of its sales to the Army constituted the requisite consideration. This argument misses the mark, however. NISH was entitled to its fee only in the event that Knox actually made sales to the Army, and its entitlement to the fee was established by regulation, not by contract. The fee NISH eventually got cannot constitute consideration for the MOU and the Addendum when the condition precedent for the entitlement to the fee—Knox making sales to the Army—was not required by the MOU and the Addendum. Again, Knox could have decided not to enter into a contract with the Army without breaching any contractual obligation to NISH; had it made that unilateral decision, NISH would not have received any fee at all from Knox, even if NISH had wholly performed its obligations to Knox as set forth in the MOU and the Addendum.

Because there was no contract between NISH and Knox, NISH is entitled to summary judgment on Knox's breach of contract claim.

### B. Promissory Estoppel

Unlike the breach of contract claim, there is a substantive difference between Indiana and Virginia law that is relevant to Knox's claim for promissory estoppel: the parties agree that Indiana recognizes such a claim, while Virginia does not. Accordingly, it is necessary for the Court to undergo the choice of law analysis with regard to Knox's promissory estoppel claim.

Because a federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state, *Land v. Yahama Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001), Indiana choice of law rules must be applied in this case. Indiana applies contract choice of law rules to claims for promissory estoppel. *See Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 626 (Ind. App. 1983).

> Indiana's choice of law rule for actions on contract calls for applying the law of the forum with the most intimate contacts to the facts. The court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact. Indiana follows the approach formulated by the Restatement (Second) of Conflict of Laws. In the absence of an effective choice of law by the parties, the contacts to be taken into account include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. App. 1997) (citations omitted).

In this case, the parties agree that there is no one place of contracting or negotiation, and the parties are domiciled in different states, so the first two and the last factors are each a wash. With regard to the remaining factors, Knox argues that the place of performance and the subject matter of the MOU and the Addendum are both Indiana because "the purpose of this contract was to induce [Knox] to undertake the manufacture of shirts in Indiana by employees working in Indiana." Knox Brief at 9. That argument is misplaced.[2] As discussed above, the MOU and Addendum did not require Knox to manufacture shirts, in Indiana or elsewhere. Rather, to the extent that any promise was made in the MOU and the Addendum, it was *NISH's* promise to make an allocation of the Army's shirt order. As Knox acknowledges, the place of performance of that promise was NISH's location—Virginia. Accordingly, Virginia had the most intimate contacts with the promise that Knox seeks to enforce by means of its promissory estoppel claim, and Virginia law applies to that claim.

Because the parties agree that Virginia does not recognize a claim for promissory estoppel, NISH's motion for summary judgment is granted as to that claim.

### IV. <u>CONCLUSION</u>

For the reasons set forth above, summary judgment in **GRANTED** in favor of NISH on both claims in Knox's Amended Complaint.

---

[2] Knox also points out that "if Knox had failed to perform its duty to make payment to NISH, then the choice of law analysis would suggest that Indiana law should apply" and notes that "[t]he state with the most intimate contacts should not change based on which party breached its obligation." Knox Brief at 9. The problem with this argument is that Knox had no obligation to pay NISH anything under the MOU and Addendum because Knox had no duty to produce and/or sell any shirts until it entered into its contract with the Army. Any action for nonpayment by NISH against Knox would have to be for breach of Knox's duty under the Regulations; it would not be a breach of contract action based upon the MOU and Addendum.

SO ORDERED: 02/20/2013

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification